UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CHRISTINE THERESA MACIELAK,

              Plaintiff,                     Civil Action No. 13-10148

      v.                            District Judge Stephen J. Murphy, III
                                      Magistrate Judge Laurie J. Michelson

COMMISSIONER OF
SOCIAL SECURITY,

              Defendant.
_____/

## REPORT AND RECOMMENDATION TO
## GRANT IN PART PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [11] AND DENY DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [12]

Plaintiff Christine Theresa Macielak appeals Defendant Commissioner of Social Security's denial of her application for disability insurance benefits. (*See* Dkt. 1, Compl.) Before the Court for a report and recommendation (Dkt. 3) are the parties' cross-motions for summary judgment (Dkts. 11, 12). For the reasons set forth below, this Court finds that the ALJ failed to consider whether based on her treating psychiatrist's opinion, Macielak was entitled to a closed period of disability benefits. The Court therefore RECOMMENDS that Plaintiff's Motion for Summary Judgment (Dkt. 11) be GRANTED IN PART, that Defendant's Motion for Summary Judgment (Dkt. 12) be DENIED, and that, pursuant to 42 U.S.C. § 405(g), the decision of the Commissioner of Social Security be REMANDED for further proceedings on whether Plaintiff is entitled to a closed period of disability benefits.

### I. BACKGROUND

Macielak was 47 years old when she alleges she became disabled. (*See* Tr. 71.) She graduated high school and attended a few years of college. (*See* Tr. 24, 99, 202.) Macielak was working part time as a direct care worker at a group home in June 2009 when her depression worsened and she began having auditory hallucinations. (*See* Tr. 25, 100.) She was fired after having a physical altercation with another employee, and has not worked since. (*See* Tr. 25, 30, 204.) Macielak previously worked as a part-time receptionist in a real estate office, in addition to her direct care work. (*See* Tr. 26, 100.)

**A. Procedural History**

On June 29, 2010, Plaintiff protectively filed for disability insurance benefits asserting that she became unable to work on June 30, 2009. (Tr. 39, 71.) The Commissioner initially denied Plaintiff's disability application on December 7, 2010. (Tr. 39.) Plaintiff then requested an administrative hearing, and on October 13, 2011, she appeared with counsel before Administrative Law Judge Melvyn B. Kalt, who considered her case *de novo*. (Tr. 21–38.) In an October 21, 2011 decision, the ALJ found that Plaintiff was not disabled within the meaning of the Social Security Act. (*See* Tr. 17.) The ALJ's decision became the final decision of the Commissioner on December 13, 2012, when the Social Security Administration's Appeals Council denied Plaintiff's request for review. (Tr. 1.) Plaintiff filed this suit on January 15, 2013. (Dkt. 1, Compl.)

**B. Medical Evidence**

According to a "Discharge Summary" from Macomb County Community Mental Health, Macielak's diagnosis as of March 25, 2009, was major depressive disorder, recurrent, severe without psychotic features, and bipolar disorder, most recent episodes mixed, severe without

psychotic features. (Tr. 196.) Her Global Assessment of Functioning ("GAF") score was 51.[1]

Macomb County discharged Macielak from outpatient services after she "showed 4/7/09 however, decided not to keep appointment and withdrew request for services." (Tr. 198.)

Macielak returned to Macomb County on June 29, 2010. (Tr. 200.) At the intake assessment, she was diagnosed with major depressive disorder, recurrent, severe with psychotic features, with a GAF of 40.[2] (Tr. 211.) The therapist, David Perkins, LMSW, ACSW, noted her "current symptoms of experiencing a severe depressive mood leading her to feel helpless and hopeless" and "hallucinations consisting of hearing female voices having a conversation that are coming from the basement when no one was there." (*Id.*) He indicated that her functional capacity was impaired in the areas of personal hygiene and self-care, self-direction, activities of daily living, learning and recreation, and social transactions and interpersonal relationships. (Tr. 212.) In addition to psychiatric evaluation and case management assistance, Perkins recommended "vocational assessment and training once her mood symptoms have stabilized to

---

[1] A GAF score is a subjective determination that represents "the clinician's judgment of the individual's overall level of functioning." American Psychiatric Assoc., *Diagnostic and Statistical Manual of Mental Disorders ("DSM–IV"),* 30–34 (4th ed., Text Revision 2000). It ranges from 100 (superior functioning) to 1 (persistent danger of severely hurting self or others, persistent inability to maintain minimal personal hygiene, or serious suicidal act with clear expectation of death). *Id.* at 32. A GAF score of 51 to 60 reflects "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." *Id.* at 34.

[2] A GAF score of 31 to 40 reflects "[s]ome impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school)." *DSM–IV* at 34.

assist her in obtaining stable employment." (Tr. 213.)

Psychiatrist Sylvia Hanson of Macomb County completed a psychiatric evaluation of Macielak on July 7, 2010. (Tr. 215.) Dr. Hanson diagnosed bipolar I disorder, most recent episodes depressed, severe with psychotic features; and rule-out schizoaffective disorder. (Tr. 218.) She assessed a GAF of 40. (*Id.*) Dr. Hanson noted that Macielak was not medicated at that time. (*Id.*) She prescribed Depakote for mood stabilization, Paxil for depression and anxiety, Risperdal for psychotic symptoms, and Remeron for sleep, and also recommended psychotherapy. (*Id.*) On a checklist of psychiatric symptoms, Dr. Hanson indicated Macielak had impaired concentration, persecutory delusions, and was unable to make daily life decisions. (Tr. 217.) She also indicated that Macielak had average intelligence, adequate fund of knowledge, and was oriented in all areas. (*Id.*) Dr. Hanson administered some cognitive testing and found that Macielak's recent and remote memory were good, immediate recall was fair, and concentration testing was poor. (*Id.*)

On August 19, 2010, Dr. Hanson completed a Mental RFC form submitted by the Michigan Department of Human Services. (Tr. 230–31.) The form instructed that "[e]ach mental activity is to be evaluated within the context of the individual's limitation for sustaining those activities over a normal workday and workweek, on an ongoing, appropriate and independent basis." (Tr. 230.) Dr. Hanson indicated that Macielak was "markedly limited" in ability to remember locations and work-like procedures; understand, remember, and carry out detailed instructions; maintain concentration and attention for extended periods; perform activities within a schedule (including maintain regular attendance, and be punctual within customary tolerances);

4

sustain an ordinary routine without supervision; work in coordination with or proximity to others without being distracted by them; make simple work-related decisions; complete a normal workday and workweek without interruptions from psychologically-based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods; interact appropriately with the general public; get along with co-workers or peers without distracting them or exhibiting behavioral extremes; respond appropriately to change in the work setting; and set realistic goals or make plans independently of others. (Tr. 230–31.) But Dr. Hanson noted: "Patient recently started treatment. Needs time to stabilize clinically." (Tr. 231.) She also wrote: "[She] is unable to work gainfully due to her psychiatric instability." (*Id.*)

The records show that Dr. Hanson treated Macielak on a monthly basis for almost a year after that opinion, through June 7, 2011. (Tr. 219–301.) Dr. Hanson's notes for each appointment from August 2010 to February 2011 record improvement in symptoms, with no change in medication. (*See* Tr. 223–24, 264–65, 271–72, 278–79, 285–86, 292–93.) In March 2011, Macielak reported recurrent anxiety. (Tr. 257.) Dr. Hanson added a prescription for Buspar, and increased it in April 2011. (Tr. 251, 258.) Macielak's prescriptions otherwise remained the same throughout Dr. Hanson's treatment, and Macielak continued to improve. (*See* Tr. 236–37, 243–44.) Macielak's GAF was assessed as 50 at each appointment throughout the year of treatment.[3] (Tr. 225, 237, 244, 252, 259, 266, 273, 280, 287, 294.)

Dr. Hanson's diagnosis at the end of that period, in June 2011, was bipolar I disorder,

---

[3] A GAF score of 41 to 50 reflects "[s]erious symptoms (e.g. suicidal ideation, severe obsession rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g. no friends, unable to keep a job)." *DSM–IV* at 34.

5

most recent episode depressed, severe with psychotic features; and rule-out schizoaffective disorder; with a GAF of 50. (Tr. 237.) In the "Impressions" section of Dr. Hanson's Medication Review form for the June 2011 appointment, she wrote, "Reports improved anxiety, stable depressive & psychotic [symptoms] & compliance with her meds," "level of function: able to do her adl's," "Hygiene/grooming/self care: adequate," and "Self-direction: poor." (Tr. 236.) Dr. Hanson gave Macielak a rating of one out of six, meaning "Very Mild," in the areas of depressive mood, excitement, anxiety, suspiciousness, delusions, and hallucinations. (Tr. 235–36.) She gave Macielak zero out of six, indicating no impairment or reason for concern, in the areas of grooming and hygiene, blunted affect, guilt feelings, increased latency of response, relationships with friends and peers, and conceptual disorganization. (Tr. 233–35.)

The current record also contains an August 16, 2012 letter from Dr. Hanson, but this letter was not part of the record before the ALJ at the time of his October 21, 2011 decision. (*See* Tr. 302.)

### C. Testimony at the Hearing Before the ALJ

#### 1. Plaintiff's Testimony

Macielak testified that she stopped working in June 2009 when her "depression got much worse" and she "started to hear noises and sounds and voices coming from the basement." (Tr. 25.) She was working in a group home at the time, and "started not being able to get along with anybody." (*Id.*) She "got into a big fight with one of the other staff over there and almost came to blows with her." (*Id.*) Macielak said: "I just couldn't control it. I was like a different person." (*Id.*) She had not looked for work because her symptoms were "so bad," she said: "Half the time

6

I don't get out of bed. I find it hard to even bathe or brush my teeth or do any of those things."
(Tr. 27.)

Macielak testified that she was supposed to be doing some housecleaning and errands for her mother, but "a lot of that stuff just slides" and her mother had to arrange everything around Macielak's schedule because the medications Macielak was taking caused her to fall asleep in the afternoon. (Tr. 27.) She said she had not stayed awake for eight straight hours since starting the medication. (Tr. 31.)

Macielak was being compensated for that work through Michigan's Department of Human Services. (*Id.*) When Macielak's attorney asked whether she could do the same work for other people, Macielak testified: "No, because my mother arranges everything around my schedule, and if I have to let something go and the laundry piles up or I'm not able to take her to an appointment, she will cancel it and reschedule it where I don't think anybody else would put up with that." (*Id.*)

When asked to describe her symptoms aside from sleep disturbance, Macielak said her depression caused a lot of anger and rage, as well as lethargy and a loss of energy. (Tr. 28.) She said, "I feel like I'm caught between the medication sucking the life out of me or the depression sucking the life out of me." (*Id.*) Since starting treatment with Dr. Hanson, Macielak said her temper tantrums have improved but the depression, loss of energy, tiredness, and needing to sleep and lay down all the time were still there. (Tr. 29.)

Macielak also told the ALJ that her mother accompanied her everywhere except to her psychiatrist; Macielak was afraid to be alone because that was when she had "the most potential

for like hallucinations." (Tr. 29.)

When the ALJ asked her to explain why she stopped looking for work, Macielak said her concentration, which is "off to start with," is made worse by her medication. (*See* Tr. 30.) She had previously weaned herself off the medication so that she could work, but after she "almost ended up in jail" over her fight with a coworker, Dr. Hanson told her she had to stay on the medication or risk the tantrums and delusional episodes. (*See id.*) Macielak said Dr. Hanson told her, "one of these days something's going to happen that you're really going to regret," so she decided she could not work. (*See* Tr. 31.) She said, "I decided that I can't work and take the medication at the same time because I'm sleeping during the daytime." (*Id.*)

The ALJ summarized Macielak's "Catch-22": "So what you're telling us is that the main reason you can't work is because of the side effects of the medications that you're taking," but "if you didn't take the medication, then your condition would prevent you from working." (Tr. 31–32.)

### 2. The Vocational Expert's Testimony

The ALJ solicited testimony from a vocational expert ("VE") to determine whether jobs would be available for someone with functional limitations approximating Plaintiff's.

The VE testified that if Macielak's testimony were fully credible, there would not be any jobs she could do. (Tr. 32–33.) The VE said Macielak could not do her past work as a direct care worker or receptionist because of the sleeping and fatigue side effects of her medication. (*See* Tr. 33.) If Macielak were not taking the medication, the VE said, there would not be any jobs available due to: "difficulty getting along with people, having paranoid thoughts, delusions,

some auditory hallucinations, and the severity of her depression as far as being lethargic or lack of motivation, anger difficulties, all the things that she described that were happening to her when she was off her medication." (*See* Tr. 32–33.)

The ALJ asked whether jobs would be available if Macielak "could come to work every day, stay there every day," but have "no public contact and no contact with coworkers other than very occasional interaction and very limited interaction with supervision," and where "the requirement for concentration is minimal. Simple one, two, three-step operations." (Tr. 34.) The VE said unskilled work such as sorter, visual inspector, and final assembler would be available: 7,000 jobs locally at the sedentary exertional level and 15,000 for light exertion. (*See* Tr. 34.) Macielak's testimony about inability to get along with others would not preclude those jobs. (*See* Tr. 34–35.)

Macielak's attorney asked the VE whether work would be available for a claimant with the impairments described in Dr. Hanson's RFC, if fully credited. (*See* Tr. 36.) The VE said: "Taking the document as a whole, the number of entries under markedly limited clearly would preclude any employment." (*Id.*) The VE said that a marked limitation in ability to sustain an ordinary routine without supervision would preclude Macielak's past work. (*See* Tr. 37.) Marked limitation in ability to respond appropriately to changes in the work setting would not affect the availability of jobs, she said, but marked limitation in ability to set realistic goals, "if it's pertaining to productivity and they couldn't meet those goals, then that certainly could indicate a difficulty with performing those jobs. (*See* Tr. 37.)

## II. THE ALJ'S APPLICATION OF THE DISABILITY FRAMEWORK

Under the Social Security Act, disability insurance benefits and supplemental security income "are available only for those who have a 'disability.'" *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). The Act defines "disability," in relevant part, as the

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. § 423(d)(1)(A); 20 C.F.R. § 404.1505 (DIB); 20 C.F.R. § 416.905 (SSI).

The Social Security regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> 1. If claimant is doing substantial gainful activity, he is not disabled.
>
> 2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.
>
> 3. If claimant is not doing substantial gainful activity and is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.
>
> 4. If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.
>
> 5. Even if claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that accommodates his residual functional capacity and vocational factors (age, education, skills, etc.), he is not disabled.

*Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997); *see also* 20 C.F.R.

10

§§ 404.1520, 416.920. "The burden of proof is on the claimant throughout the first four steps . . . . If the analysis reaches the fifth step without a finding that the claimant is not disabled, the burden transfers to the [Commissioner]." *Preslar v. Sec'y of Health and Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

At step one, ALJ Kalt found that Plaintiff had not engaged in substantial gainful activity since the alleged disability onset date of June 30, 2009. (Tr. 14.) At step two, he found that Plaintiff had the following severe impairments: bipolar and schizoaffective disorders. (Tr. 14–15.) Next, the ALJ concluded that none of these impairments, alone or in combination, met or medically equaled a listed impairment. (Tr. 15.) Between steps three and four, the ALJ determined that Plaintiff had the residual functional capacity to "perform a full range of work at all exertional levels but with the following nonexertional limitations: only simple, unskilled work with limited contact with supervisors, and no contact with co-workers or the public." (Tr. 15.) At step four, the ALJ found that Plaintiff was unable to perform any past relevant work. (Tr. 16.) At step five, based on vocational expert testimony, the ALJ found that sufficient jobs existed in the national economy for someone of Plaintiff's age, education, work experience, and residual functional capacity. (Tr. 16–17.) The ALJ therefore concluded that Plaintiff was not disabled as defined by the Social Security Act from the alleged onset date through the date of his decision. (Tr. 17.)

**III. STANDARD OF REVIEW**

This Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). Judicial review under this statute is limited: the Court "must

affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal quotation marks omitted).

Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotation marks omitted). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations omitted); *see also Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (en banc) (noting that the substantial evidence standard "presupposes . . . a zone of choice within which the decisionmakers can go either way, without interference by the courts" (internal quotation marks omitted)).

When reviewing the Commissioner's factual findings for substantial evidence, the Court is limited to an examination of the record and must consider that record as a whole. *Bass v. McMahon*, 499 F.3d 506, 512–13 (6th Cir. 2007); *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). The Court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council." *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). There is no requirement, however, that either the ALJ or this Court discuss every piece of evidence in the administrative record. *Kornecky v. Comm'r of Soc. Sec.*, 167 F.

App'x 496, 508 (6th Cir. 2006). Further, this Court does "not try the case de novo, resolve conflicts in evidence, or decide questions of credibility." *Bass*, 499 F.3d at 509; *Rogers*, 486 F.3d at 247.

## IV. ANALYSIS

### A. Evaluation of Dr. Hanson

Plaintiff argues that the ALJ erred by failing to give controlling weight to the opinion of Macielak's treating psychiatrist, Dr. Hanson, because he did not consider the requisite factors and because there was no medical opinion in the record that contradicted Dr. Hanson's opinion. (Pl.'s Mot. Summ. J. at 8–11.) Defendant argues that the ALJ's evaluation of Dr. Hanson's opinion was supported because the ALJ found the opinion was not consistent with medical evidence, and because the opinion did not state specific functional limitations or explain medical findings that supported the conclusions.[4] (Def.'s Mot. Summ. J. at 11–14.)

The Sixth Circuit has emphasized that "[a]s a general matter, an opinion from a medical source who has examined a claimant is given more weight than that from a source who has not performed an examination (a 'nonexamining source') . . . and an opinion from a medical source who regularly treats the claimant (a "treating source") is afforded more weight than that from a

---

[4] Defendant also argues, correctly, that Plaintiff's reliance on Dr. Hanson's August 16, 2012 letter is improper because the letter was not part of the record before the ALJ. (Id. at 15.) The Court agrees, and will not consider the letter. *See Davenport v. Comm'r of Soc. Sec.*, No. 10-13842, 2012 WL 414821, at *1 n. 1 (Jan. 19, 2012), *report and recommendation adopted by*, 2012 WL 401015 (E.D. Mich. Feb. 8, 2012) ("In this circuit, where the Appeals Council considers additional evidence but denies a request to review the ALJ's decision . . . those 'AC' exhibits submitted to the Appeals Council are not part of the record for purposes of judicial review." (citing *Cotton v. Sullivan*, 2 F.3d 692, 696 (6th Cir. 1993); *Cline v. Comm'r of Soc. Sec.*, 96 F.3d 146, 148 (6th Cir.1996))).

source who has examined the claimant but does not have an ongoing treatment relationship (a 'nontreating source')." *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 375 (6th Cir. 2013). The opinion of a treating physician, in particular, is the subject of a special rule: "An ALJ must give the opinion of a treating source controlling weight if he finds the opinion 'well-supported by medically acceptable clinical and laboratory diagnostic techniques' and 'not inconsistent with the other substantial evidence in [the] case record.'" *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) (quoting former 20 C.F.R. § 404.1527(d)(2) now § 404.1527(c)(2)); *see also Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013).

Even if the ALJ finds that a treating physician's opinion is not entitled to "controlling weight," there is a rebuttable presumption that the opinion of a treating physician is entitled to "great deference." *Rogers*, 486 F.3d at 242; *see also* Soc. Sec. Rul. 96-2p, 1996 WL 374188, at *4. To rebut the presumption, the ALJ must show that substantial evidence supports not deferring to the treating source. *See Rogers*, 486 F.3d at 246. This includes demonstrating that he considered the non-exhaustive list of factors in 20 C.F.R. § 404.1527(c) and 20 C.F.R. § 416.927(c). *See Rogers*, 486 F.3d at 242 ("When the treating physician's opinion is not controlling, the ALJ, in determining how much weight is appropriate, must consider a host of factors, including the length, frequency, nature, and extent of the treatment relationship; the supportability and consistency of the physician's conclusions; the specialization of the physician; and any other relevant factors."); *see also Wilson*, 378 F.3d at 544; Soc. Sec. Rul. 96-2p, 1996 WL 374188, at *4.

As a procedural matter, the ALJ must expressly provide "good reasons" for the weight

14

assigned to a treating-source opinion. *See Gayheart*, 710 F.3d at 376; *Rogers*, 486 F.3d at 243; *Wilson*, 378 F.3d at 544. The Court emphasizes that this right is substantial: abridgement warrants remand even when substantial evidence supports the ALJ's ultimate disability determination. *Rogers*, 486 F.3d at 243. Stating that a treating-source opinion is "not supported by treating records," or is in "conflict[] with the record as a whole and is not fully supported by the objective evidence" while citing every medical exhibit in the administrative record save one, does not suffice to comply with the reasons-giving requirement. *See Friend v. Comm'r of Soc. Sec.*, 375 F. App'x 543, 552 (6th Cir. 2010) ("Put simply, it is not enough to dismiss a treating physician's opinion as 'incompatible' with other evidence of record; there must be some effort to identify the specific discrepancies and to explain why it is the treating physician's conclusion that gets the short end of the stick." (citation omitted)).

Here, the ALJ concluded that Macielak's "treating physician's assertion that the claimant could not work because of psychiatric instability is not entitled to controlling weight, since it is not consistent with the medical evidence, which shows that the claimant's status is unremarkable when she follows through with treatment." (Tr. 16.) This conclusion is the last sentence of a paragraph in which the ALJ summarizes Macielak's treatment records:

> The claimant is stable when she takes her medications and she should be able to perform some simple, routine, unskilled work. Clinical reports demonstrate that her mood was better and that her behavior was more cooperative. She was no longer experiencing suicidal or psychotic ideation. She was fully oriented to reality, and she could function appropriately within the community, perform her daily living activities, drive, and manage money.

(Tr. 15.)

15

The ALJ expressly addressed only the first step of the treating source rule by stating that Dr. Hanson's opinion was not controlling because it was not consistent with the evidence; he did not go on to separately address the 20 C.F.R. § 404.1527(c) factors and enumerate "good reasons" for not deferring to her opinion. Nonetheless, it is apparent from the ALJ's discussion of the evidence that the reason he discounted the opinion was that Macielak subsequently improved with treatment. *See Wilson*, 378 F.3d at 547 (providing that an ALJ's failure to provide to comply with the "terms" of the reasons-giving requirement might be harmless where the ALJ complied with the "goal" of the rule); *Friend*, 375 F. App'x at 551 ("[T]he procedural rule is not a procrustean bed, requiring an arbitrary conformity at all times. If the ALJ's opinion permits the claimant and a reviewing court a clear understanding of the reasons for the weight given a treating physician's opinion, strict compliance with the rule may sometimes be excused."). The ALJ's discussion of Macielak's improvement with treatment was sufficient reason to discount Dr. Hanson's opinion as it relates to Macielak's condition when treated.

But Dr. Hanson's August 2010 opinion was written more than a year after Macielak's alleged onset of disability, in June 2009. The ALJ failed to consider whether based on Dr. Hanson's opinion, Macielak was entitled to a closed period of disability benefits. A claimant who meets the twelve-month durational requirement of 42 U.S.C. § 423(d)(1)(A) may be entitled to benefits from the time her disability commences until such time as the disability ceases. *See Howse v. Heckler*, 782 F.2d 626 (6th Cir.1986). The ALJ's failure to consider whether Macielak should be awarded a closed period of benefits in light of Dr. Hanson's August 2010 opinion, which was not contradicted by any other medical opinion, requires remand. *See Lang v. Sec'y of*

16

*Health & Human Servs.*, 875 F.2d 865 (6th Cir. 1989) (remanding because the ALJ "did not specifically make a finding regarding whether plaintiff's impairments entitled him to a closed period of disability benefits," where "of those doctors who expressed an opinion as to plaintiff's disability during this period, all concluded plaintiff was disabled as a result of his physical limitations"); *Donovan v. Comm'r of Soc. Sec.*, No. 12-14671, 2013 U.S. Dist. LEXIS 164915 (E.D. Mich. 2013) (remanding for further proceedings on whether Plaintiff is entitled to a closed period of disability benefits); *Widener v. Astrue*, No. 08-107, 2009 WL 2778215, at *5 (E.D. Ky. Aug. 27, 2009) ("[B]ecause the ALJ failed to address whether Plaintiff was entitled to a closed period of disability, the Court concludes that remand is required so that the ALJ may make specific findings regarding whether Plaintiff's multiple surgeries during the three-year period beginning November 2000 rendered her disabled during that discrete period.").

### B. Concentration, Persistence, or Pace

Plaintiff argues that the ALJ erred by failing to account for her difficulties in maintaining concentration, persistence, or pace ("CPP") in the RFC and the hypothetical question to the vocational expert. (Pl.'s Mot. Summ. J. at 11–12, 15–16.) Relatedly, Plaintiff argues that "the ALJ failed to properly assess the plaintiff's mental limitations pursuant to 20 CFR Section 404.1520a which requires an evaluation of the individual's ability to sustain work, using appropriate production standards, in either real or simulated work tasks, e.g., task completion within acceptable time periods." (Pl.'s Mot. Summ. J. at 11.) But as Plaintiff acknowledges, the ALJ found that Macielak had moderate difficulties in maintaining concentration, persistence, or pace. (*See* Pl.'s Mot. Summ. J. at 12, 14; *see* Tr. 16.)

17

Defendant points out that Dr. Hanson concluded Macielak was not significantly limited in her ability to understand, remember, and carry out one-or two-step instructions, and that the ALJ did instruct the VE at the hearing to include only jobs that required minimal concentration. (Def.'s Mot. Summ. J. at 18–20.)

The ultimate question is whether substantial evidence supports the ALJ's choice of limitations in the RFC assessment and corresponding hypothetical; the ALJ need not include "talismanic language" in his hypothetical whenever he finds the claimant has CPP limitations. *See Smith v. Halter*, 307 F.3d 377, 378–79 (6th Cir. 2001). Although some cases have suggested that an RFC limiting a claimant to "unskilled" or "simple, routine" work is not sufficient to account for "moderate" limitations in CPP because the claimant may have difficulty staying on task or keeping pace even when performing unskilled or simple, routine work, other decisions have recognized that limiting a claimant to unskilled or simple, routine work is sufficient because at least some claimants with those limitations can stay on task and keep pace when the work is simple. *See White v. Comm'r of Soc. Sec.*, No. 12-12833, 2013 WL 4414727 (E.D. Mich. Aug. 14, 2013)  (discussing case law).

The RFC formulated by the ALJ does not include some of the marked limitations noted by Dr. Hanson in her August 2010 opinion, which, as discussed above, the ALJ should have considered for a closed period of benefits. In particular, the ALJ's RFC does not account for Dr. Hanson's indication that Macielak had marked limitations in ability to sustain an ordinary routine without supervision, complete a normal workday without interruptions from psychologically based symptoms, and perform at a consistent pace without an unreasonable

18

number and length of rest periods. (Tr. 231.) In fact, the VE testified that Dr. Hanson's RFC, if fully credited, would preclude all work. (*See* Tr. 36.) Thus, to the extent that the ALJ determines on remand that Dr. Hanson's opinion should be credited with regard to a closed period before Macielak's condition improved with treatment, the RFC must be re-evaluated as well, for that period.

But for the period during which Macielak was responding well to treatment, the ALJ's findings regarding CPP do not require remand. His assessment of moderate difficulties in maintaining concentration, persistence, or pace is supported by substantial evidence; Dr. Hanson indicated only mild impairment throughout 2011. (*See* Tr. 232–273.) The only CPP-related limitations in the ALJ's RFC was a limitation to "simple, unskilled work," but the VE testified that jobs would be available if "the requirement for concentration is minimal" and limited to "[s]imple one, two, three-step operations." (Tr. 34.) The ALJ's failure to include these limitations in his RFC in the opinion was harmless, since they did not affect the VE's testimony that jobs would be available.

### C. Medication Side Effects

Plaintiff argues that the ALJ erred by rejecting Plaintiff's testimony about the side effects of her medication. (Pl.'s Mot. Summ. J. at 12–13.) Defendant argues that the ALJ considered her testimony about drowsiness as a side effect, and ultimately concluded that the medical evidence failed to support the existence of any complaints from Plaintiff to her doctors. (Def.'s Mot. Summ. J. at 21.)

According to the ALJ:

19

> The claimant testified at the hearing that her depression, temper tantrums, and hallucinations all respond to medication but that it is the side effect of drowsiness, that keeps her from working. The undersigned notes that nowhere in the written record does the claimant allege a problem with side effects from her medication. Therefore, this argument is not found to be credible.

(Tr. 16.) The Court's review of the record confirms that Macielak did not allege drowsiness as a side effect of her medications in the written components of her application, including a form that asked her to list her medications and any side effects from them. (Tr. 112.) Nor is there any mention of drowsiness, excessive sleeping or napping, or similar side effects in Macielak's medical records. In fact, Dr. Hanson's Medication Review Notes contain a section that specifically addresses side effects, and for each appointment she checked a box labeled "Consumer Denies." (See Tr. 219, 232, 239, 246, 253, 260, 267, 274, 281, 288.) The ALJ's conclusion that Macielak's allegation of drowsiness was not credible is supported by substantial evidence.

The cases Plaintiff cites do not compel a different conclusion. There is no medical evidence corroborating Macielak's alleged side effects, unlike the blurred vision alleged in *Narrol v. Heckler*, 727 F.2d 1303, 1307 (D.C. Cir. 1984) ("the ophthamologist's report . . . indicated that Narrol had early cataracts in both eyes with recent progression in the right eye"). Macielak did not allege that she told her doctor about the side effects and it was just not written down in the treatment notes, as in *Richardson v. Apfel*, 9 F. Supp. 2d 666, 670 (N.D. Tex. 1998) ("Richardson testified that he did complain to his physicians about the side effects of his many medications, and that mere silence in physician treatment notes of any complaint related to

medication does not constitute 'substantial evidence' when rebutted by Richardson's direct evidence to the contrary."). Moreover, Dr. Hanson's repeated indication that Macielak denied side effects is not mere silence; it is contradiction. *Cf. Bowman v. Barnhart*, 310 F.3d 1080, 1085 (8th Cir. 2002) (holding the ALJ was obligated to develop the evidence as to medication side effects and contact the claimant's treating physician for additional information and clarification, where treatment notes were "somewhat cursory").

### D. Credibility

Plaintiff's motion states in a heading that the ALJ "did not properly assess the Plaintiff's complaints of depression, anxiety and credibility" (Pl.'s Mot. Summ. J. at 8), but does not provide any argument or discussion to support this conclusion (so far as the Court could tell from Plaintiff's disorganized brief, which would better be called a haphazard collection of notes for a brief ). The Court declines to address an issue that Plaintiff merely mentions perfunctorily without developing an argument. *See Kennedy v. Comm'r of Soc. Sec.*, 87 F. App'x 464, 466 (6th Cir. 2003) ("[I]ssues which are adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.") (internal quotation marks and citation omitted); *Baldwin v. Astrue*, No. 08-395, 2009 WL 4571850, at *3 (E.D. Ky. Dec. 1, 2009) ("The Plaintiff is represented by counsel, and the Court is not required to formulate arguments on the Plaintiff's behalf.").

## V. CONCLUSION AND RECOMMENDATION

For the reasons set forth above, this Court finds that the ALJ failed to consider whether based on her treating psychiatrist's opinion, Macielak was entitled to a closed period of disability

benefits. The Court therefore RECOMMENDS that Plaintiff's Motion for Summary Judgment (Dkt. 11) be GRANTED IN PART, that Defendant's Motion for Summary Judgment (Dkt. 12) be DENIED, and that, pursuant to 42 U.S.C. § 405(g), the decision of the Commissioner of Social Security be REMANDED for further proceedings on whether Plaintiff is entitled to a closed period of disability benefits.

## VI. FILING OBJECTIONS

The parties to this action may object to and seek review of this Report and Recommendation within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596 (6th Cir. 2006); *United States v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *McClanahan v. Comm'r Soc. Sec.*, 474 F.3d 830, 837 (6th Cir. 2006); *Frontier*, 454 F.3d at 596–97. Objections are to be filed through the Case Management/Electronic Case Filing (CM/ECF) system or, if an appropriate exception applies, through the Clerk's Office. *See* E.D. Mich. LR 5.1. A copy of any objections is to be served upon this magistrate judge but this does not constitute filing. *See* E.D. Mich. LR 72.1(d)(2). Once an objection is filed, a response is due within fourteen (14) days of service, and a reply brief may be filed within seven (7) days of service of the response. E.D. Mich. LR

72.1(d)(3), (4).


Date:   November 26, 2013                        s/Laurie J. Michelson_____
                                                 Laurie J. Michelson
                                                 United States Magistrate Judge




CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing document was served on the attorneys and/or parties of record by electronic means or U.S. Mail on November 26, 2013.


                        s/Jane Johnson_____
                        Deputy Clerk




23